OPINION
{¶ 1} This matter comes for consideration upon the record in the trial court and the parties' briefs. Appellant Sabrina Bray appeals the decision of the Mahoning County Court of Common Pleas convicting her of Complicity to Murder in violation of R.C. 2903.02(A)(D) with a firearm specification. With this appeal, Bray challenges her conviction on two grounds.
 {¶ 2} First, Bray contends that the trial court erred by charging the jury with complicity instructions at the end of the trial when the State did not initially charge Bray with complicity, nor did they proceed with a complicity theory at trial. Pursuant to R.C. 2923.03(F), "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." Accordingly, the State need not specifically charge a defendant with complicity when they are alleged in the indictment to be the principal.
 {¶ 3} Furthermore, at trial, Bray's defense to the murder charge was not that she wasn't present at the shooting. Rather, Bray's defense was that she simply was not the shooter. Because she pointed the finger at another person present at the time of the crime, she opened the door to a complicity charge while trying to close the door on the murder charge. Thus, it appears the trial court properly instructed the jury on complicity.
 {¶ 4} Second, Bray alleges that she received ineffective assistance of counsel based upon his failure to request a bill of particulars. More specifically, Bray claims that if he had done so, counsel would have been aware that the State would be asking for the complicity charge. Although the failure to request a bill of particulars is not necessarily ineffective assistance of counsel, counsel may have been ineffective for a greater deficiency.
 {¶ 5} It appears from the record that both Bray and her counsel were unaware that a charge of complicity was even an option. It appears that they both proceeded to trial with the belief that her being convicted of murder was unlikely and that she couldn't be charged with complicity because it wasn't specifically listed in the indictment. Because of this mistaken belief, it appears that counsel improperly advised Bray on how to proceed with plea negotiations and whether to go to trial. It would be difficult to say that Bray received effective assistance of counsel in this situation if counsel was unaware that Bray could be convicted of complicity for murder.
 {¶ 6} However, whether or not Bray can show prejudice by counsel's actions on direct appeal is another matter. Because the original plea agreement is outside of the record and because Bray's testimony regarding advice received by counsel at sentencing was not under oath, such a claim would be more appropriate on post-conviction. For the following reasons, we affirm the decision of the trial court.
 Facts {¶ 7} Some time prior to April 4, 2001, Alyson Buckner bought crack cocaine from Daniel "TJ" Carter. Buckner had no money and promised to pay at a later date after Bray personally vouched for her. When Buckner failed to honor the debt, it is alleged that Carter offered a reward to anyone who could bring Buckner to him. Soon after, Mona Brown brought Buckner to the house where Carter was dealing crack cocaine. She received money from Carter before she left.
 {¶ 8} Bray, Carter and Buckner left the house together so that Buckner could try to get money from a friend to pay back Carter. Buckner could not get the money. Carter testified that Bray became angry and wanted to kill Buckner. He testified that he wanted to drop her off somewhere and make her walk back home. After Carter pulled the car into a field, Buckner was shot and killed. Both Carter and Bray fled the scene but returned later to see if the body was still there. Two witnesses alleged that sometime after the shooting, Bray admitted to being the shooter.
 {¶ 9} Bray was indicted for murder in violation of R.C. 2903.02(A)(D) with a firearm specification. She was arraigned and waived her right to a speedy trial. She was brought to trial on January 28, 2004 and was convicted of complicity to murder on February 2, 2004. Bray was then sentenced to 15 years to life in prison. It is from this decision that Bray now appeals.
 Jury Charge for Complicity {¶ 10} As her first assignment of error, Bray contends:
 {¶ 11} "Appellant was denied due process rights afforded by the due process clause of the Fourteenth Amendment to the United States Constitution."
 {¶ 12} Bray argues that it was improper for the trial court to charge the jury with a complicity instruction when the State proceeded against her, from conviction to sentencing, as the principal offender.
 {¶ 13} The Supreme Court of Ohio addressed this very issue in Statev. Herring (2002), 94 Ohio St.3d 246. In that case, the defendant, Herring, was indicted on three counts of aggravated murder. In the state's second amended bill of particulars, the state specified that Herring was the principal offender in the aggravated murder of one of the victims. At the trial, however, the state requested, over Herring's objection, an instruction that the jury could convict Herring of the aggravated murder if it found that Herring was either the principal offender or an aider and abettor.
 {¶ 14} On appeal, Herring argued that the jury instruction violated his Sixth Amendment right to be informed of the nature and cause of the accusation. He asserted that because the bill of particulars indicated that he was the principal offender, he lacked notice that the trial court would instruct on accomplice liability. The Supreme Court rejected that argument, finding:
 {¶ 15} "R.C. 2923.03(F) states: `A charge of complicity may be stated in terms of this section, or in terms of the principal offense.' Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is `stated * * * in terms of the principal offense' and does not mention complicity. R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See State v. Keenan (1998), 81 Ohio St.3d 133,151, 689 N.E.2d 929." Id. at 251.
 {¶ 16} With regard to the proof needed to support a complicity instruction, the Supreme Court explained in State v. Johnson (2001),93 Ohio St.3d 240, at the syllabus:
 {¶ 17} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime."
 {¶ 18} Accordingly, we must examine the record in this case to determine if sufficient evidence was presented to make Bray aware that a charge on complicity was warranted even though such was absent from the indictment. In the present case, the following testimony supports a conviction of complicity.
 {¶ 19} Daniel Carter was the first to take the stand. On direct-examination, he testified that he and Bray sold drugs together. They were also sexual partners. He explained that Bray vouched for the victim when the victim could not afford to pay for crack that was given to her by Carter. In other words, the victim was given credit to buy drugs in exchange for Bray promising that the victim would later pay. When the victim failed to pay, Carter had someone bring the victim to his house. The victim needed to get the money from someone else. So Bray, Carter and the victim left Carter's house together. Bray told Carter that she wanted to shoot the victim. Carter testified that Bray was in the passenger seat when she shot the victim. He explained that Bray must have shot the victim through the driver's open door.
 {¶ 20} After the victim was shot and killed, Carter and Bray returned to Larry Harmon's house. After a few hours, the two went back to the scene of the crime on Carter's motorcycle to see if the victim was still there. Carter then took Bray out to a friend's house in Niles, Ohio.
 {¶ 21} On cross-examination, Carter admitted that he never contacted the police to tell them what happened. He further admitted to taking possession of the gun used to kill the victim. Carter finally admitted to beating a man with a baseball bat in March of 2001. Defense counsel asked if this beating was a result of a drug debt owed to Carter, but Carter denied this allegation. Defense counsel then suggested that Carter had a motive for shooting the victim.
 {¶ 22} Mona Brown, who was responsible for bringing the victim to Carter, took the stand next. Brown explained that, when they arrived, there seemed to be some animosity between Carter and the victim since the victim owed him money. Brown testified that the victim seemed scared to be at the house. She dropped the victim off at the house and left. She later saw Bray and Carter returning back to the house together. She didn't find out till the next day that the victim was dead. Brown said that Bray repeatedly denied shooting the victim but was intoxicated one evening and commented, "I hope they know I did it."
 {¶ 23} On cross, Brown admitted to lying to the police. She also admitted that Carter was brandishing a gun when she dropped the victim off at the house. Finally, Brown admitted to being convicted of theft in December of 2000.
 {¶ 24} During the cross of Paula Cline, an acquaintance of both Carter and Bray, defense counsel suggested that Carter was mad because the victim had been out buying drugs but still hadn't paid back her debt to him.
 {¶ 25} Finally, Officer Martin took the stand in Bray's defense. He explained that Bray's name came up in his investigation as the girlfriend of a drug dealer, Daniel Carter. He also discovered in his investigation that the victim owed money to Carter. When questioning Martin about whether Carter was ever investigated, Defense counsel asked:
 {¶ 26} "You have TJ Carter admitting to you on the record, admitting to you on the videotape that he's a drug dealer; that he puts the word out to get Alyson brought to the apartment; that he pays Mona-Brown-Williams in crack to bring her there; that he drives the murder vehicle; that he stops the murder vehicle; that he takes possession of the murder weapon afterwards and mysteriously loses it or it's stolen; but even that takes three or four times. You believe all of that, don't you?"
 {¶ 27} To which, Officer Martin responded, "Correct". The officer later testified that when Bray was originally brought into the station, she told the officers that Carter shot the girl.
 {¶ 28} In light of this testimony, which was mainly elicited during cross examination of these witnesses, it appears that defense counsel was trying to demonstrate that it was just as likely that Carter was the shooter since he was a violent drug dealer with a motive. Bray would maintain, however, that the complicity instruction was still improper as the State proceeded with the sole theory that she was the shooter.
 {¶ 29} In State v. Cornwell 86 Ohio St.3d 560, 1999-Ohio-125, the defendant likewise asserted that the trial court erred by instructing the jury on complicity, since it was never pleaded or argued that he was anything but the shooter. The Supreme Court agreed that none of the evidence and arguments proffered by the State implicated the defendant otherwise than as the sole gunman.
 {¶ 30} Notably, however, the Supreme Court explained that some of the testimony regarding the gunman's identity could be construed as conflicting. The court further reasoned that given the fact that some crucial testimony came from the defendant's accomplices, a reasonable jury could have concluded that the accomplices' testimony was less than reliable or was designed to pin the shooting on the defendant as a scapegoat. Given this possibility, the Supreme Court concluded that the trial court properly instructed the jury on complicity.
 {¶ 31} In light of the testimony given in this case and the Supreme Court's holding in Cornwell, the trial court did not error in this case by instructing the jury on complicity as Bray should have been put on notice that it was a possibility. This assignment of error is without merit.
 Ineffective Counsel — No Bill of Particulars {¶ 32} As her second and final assignment of error, Bray claims:
 {¶ 33} "Appellant was denied effective assistance of counsel and due process guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution by trial counsel's failure to file a request or motion for a bill of particulars."
 {¶ 34} Bray claims that she was prejudiced by this deficiency in counsel's performance in that she was unaware that she was going to be tried for complicity. More specifically, Bray claims that had counsel advised her that she could have been tried for complicity, she would have taken the plea offered to her by the State for involuntary manslaughter. There is some evidence in the record to support this claim. At sentencing, defense counsel fell on his sword stating:
 {¶ 35} "I am, obviously greatly disappointed not only at the fact that the jury returned a verdict of guilty as a complicitor but more so I guess in my own professional — naivety is not the appropriate word, I believe. I don't believe that I am a naïve person. Nothing in this case prior to the beginning of this trial led me to believe that the State was going to try to seek a complicitor instruction at the time of the close of the case as an alternative to the principal. Had I known or even suspected that that was going to be an option, I certainly would have advised Sabrina to seriously consider and even, in fact take the proposed plea agreement of involuntary manslaughter which carried a 13 year maximum sentence.
 {¶ 36} "Without violating the attorney/client privilege, I can advise the court today that at the time that these discussions were had regarding the potential plea, I basically took a neutral position. She had to that point steadfastly denied being the person who shot and, unfortunately, killed Allison Buckner. She always admitted her presence at the scene, but denied any further participation in any active plan to harm or shoot or kill Allison Buckner. So I took the position of this is entirely your call. If we go to trial and win on murder, which I think the State is going to have a difficult time proving given the problems that the main witness carried when they came into the courtroom, you will walk away after spending two plus years in the county jail waiting to go to trial. On the other hand, if you get convicted of that offense at trial, you are going to get 18 to life, which effectively translates to 25 or 30 years in prison at Marysville. So based on my discussions with her, she elected to proceed towards trial on murder as the principal charge, which now in hindsight has the tragically pathetic effect of probably doubling her sentence. She would have probably received — she could have received no more than 13 years on an involuntary manslaughter. And now, as I said, she would probably do 25 years based on those series of events."
 {¶ 37} When questioned by the trial court, Bray added:
 {¶ 38} "Yes. I didn't know. I just — I don't understand how I got convicted on complicity because I didn't know that they would get me for complicity, because if I would have known that, I would have never brought it to trial. I thought that I was on trial for just murder, and I still don't understand how this complicity part came up about it at all. And I am not the one that killed the girl. But I was there, but that was out of my control. That was out of my hands. I didn't have no control of what he decided that he was going to do with her. And I just don't understand none of this at all. I don't understand the guilty verdict. I don't understand the complicity. I just — I don't understand none of it."
 {¶ 39} We must determine whether this testimony, along with the actions of defense counsel at trial, demonstrates ineffective assistance of counsel. The Ohio Supreme Court has adopted a two-part test to determine whether an attorney's performance has fallen below the constitutional standard for effective assistance. To reverse a conviction for ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard or reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." State v. Madrigal, 87 Ohio St.3d 378, 388-389,2000-Ohio-448, citing Strickland v. Washington (1984), 466 U.S. 668,687-688. As to the second element of the test, the defendant must establish "that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 40} Other courts have dealt with similar situations where attorneys admit on the record that they have incorrectly advised their clients during plea negotiations. In State v. Jeffries (June 28, 2001) 8th Dist. No. 78070, the Eighth District admitted that it would be an unprofessional error and could potentially support an ineffective assistance claim if prejudice were demonstrated, explaining:
 {¶ 41} "A defendant has a right to effective assistance of counsel in considering plea offers and, while a lawyer need not always make a recommendation as to the advisability of accepting the plea offer, the defendant certainly is entitled to accurate information allowing him to compare the plea offer with the outstanding charges. Jeffries' lawyer stated in open court that he gave his client the wrong information; this is not simply a case where the defendant states he was not told of the penalties he faced, but a case where the defendant claims, and his lawyer admits, that he was actively misinformed. Contrary to the State's argument, we can imagine no strategic reason for a defense lawyer to misinform his client concerning the seriousness of the offenses and the potential penalties for each count. Such conduct falls below professional standards." Id at 3. (footnotes omitted)
 {¶ 42} The court continued:
 {¶ 43} "To show prejudice, however, Jeffries must show a reasonable probability that he would have accepted an available plea offer if he had known that one of the charges was a second degree felony carrying a mandatory prison sentence of at least two years. The record before us is inadequate to support such a determination. We are unable to accept Jeffries' unsworn statements at the sentencing hearing that he would have accepted the plea, we have no evidence of the details of the plea offer, and the State has challenged his claims of prejudice, arguing that he would have gone to trial even if properly informed. While a reasonable probability requires showing only `a probability sufficient to undermine confidence in the outcome,' resolution of these claims will require evidence outside the trial court record, and should be raised in a petition for post-conviction relief." Id.
 {¶ 44} Here, like in Jeffries, if what defense counsel has stated is in fact true, the assistance of counsel rendered in this case appears to be ineffective. However, the real question is whether prejudice has been demonstrated by the record. Because we do not have any evidence of record to substantiate Bray's allegations and it appears that any such evidence would exist only outside of the record, we cannot say that Bray was prejudiced by counsel's failure to inform her of the potential complicity conviction. Given the record, this argument is more appropriate for post-conviction proceedings. This assignment of error is also meritless. Accordingly, the judgment of the trial court is affirmed.
Vukovich, J., concurs.
Waite, J., concurs.